UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BERLINDA TAY,

                                    Plaintiff,

        v.

THE NEW YORK AND PRESBYTERIAN
HOSPITAL,

                                    Defendant.

No. 22-CV-8379 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances</u>:

Anne Melissa Seelig, Esq.
James B. Jackson, Esq.
C.K. Lee, Esq.
Lee Litigation Group, PLLC
New York, NY
*Counsel for Plaintiffs*

James Stuart Frank, Esq.
John Houston Pope, Esq.
Adriana Stefanie Kosovych, Esq.
Brian Gilbert Cesaratto, Esq.
Epstein, Becker, & Green PC
New York, NY
*Counsel for Defendant*

Jill K. Bilger, Esq.
Epstein, Becker, & Green PC
Columbus, OH
*Counsel for Defendant*

Paul DeCamp, Esq.
Epstein, Becker, & Green PC
Washington, DC
*Counsel for Defendant*

KENNETH M. KARAS, United States District Judge:

Plaintiff Berlinda Tay brings this Action against New York Presbyterian Hospital ("NYPH" or "Defendant"), individually and on behalf of all others similarly situated, alleging, inter alia, that Defendant owes her unpaid overtime wages pursuant to the Fair Labor Standards Act (the "FLSA"), 29 U.S.C. § 201 et seq., and the New York Labor Law, N.Y.L.L. § 650 et seq. (*See generally* Am. Compl. (Dkt. No. 17).)  Before the Court is Plaintiff's Motion for Conditional Collective Certification.  (*See* Not. of Mot. (Dkt. No. 78).)  For the foregoing reasons, the Motion is granted in part and denied in part.

## I.  Background

### A.  Factual Background

The following facts are taken from the Amended Complaint and the materials produced in discovery accompanying the Parties' papers.  Because this Motion arises at the conditional certification stage, what follows is background only and "should not be viewed as findings of fact."  *See King v. Fedcap Rehab. Servs., Inc.*, No. 20-CV-1784, 2022 WL 292914, at *1 n.1 (S.D.N.Y. Feb. 1, 2022).

NYPH owns and operates a non-profit network of sixteen hospitals and medical treatment centers in New York State.  (Am. Compl. ¶¶ 9–12.)  At all relevant times, Defendant was and continues to be an enterprise engaged in business within the meaning of the FLSA.  (*Id.* ¶ 26.)  Plaintiff was employed as a nurse assistant at Westchester Hospital, one of Defendant's network locations, from June 2015 to March 2022.  (*Id.* ¶ 40.)

While employed by Defendant, Plaintiff worked eight-hour weekday night shifts from 11:00 PM to 7:00 AM for a total of forty hours per week.  (*Id.* ¶ 41.)  She frequently worked additional weekend shifts, which would add another seventeen hours to her work week.  (*Id.*)  NYPH compensated Plaintiff on an hourly basis with a commensurate rate for overtime.  (*Id.*

¶ 42.)  To capture the hours she worked, NYPH required Plaintiff to punch in and punch out at the start and end of her shift.  Those punch records fed into a time management system used across NYPH locations.  (Decl. of C.K. Lee in Supp. of Mot. ("Lee Decl."), Ex. 15 at 2 (Dkt. No. 80-15); *id*., Ex. 5 ("Brown Dep.") at 7–11 (Dkt. No. 80-5).)

Plaintiff points to two NYPH policies that allegedly resulted in missed overtime pay.

First is NYPH's meal break policy.  NYPH allowed employees to take meal breaks of 30-to-45 minutes depending on the length of their shift.  (*See* Decl. of Adriana S. Kosovych in Opp. ("Kosovych Decl."), Ex. 3 at 44 (Dkt. No. 98-3).)[1]  Instead of having employees clock in or out for meal breaks, NYPH would automatically deduct meal breaks from an employees' recorded work hours on the assumption that employees would be "relieved of all duties."  (Kosovych Decl., Ex. 3 at 41 (Dkt. No. 98-3); Am. Compl. ¶ 43.)  NYPH contends the onus was on employees to "cancel" the deduction by submitting a form if they worked through a meal.  (*See* Decl. of David Brown in Opp., Ex. 1 ¶ 4 (Dkt. No. 105-1); Kosovych Decl., Ex. 2 ("Time Manual") at 2 (Dkt. No. 98-2).)[2]

Plaintiff, however, frequently could not take a "free and clear" break because supervisors would interrupt her with an emergency or with requests for assistance.  (Am. Compl. ¶¶ 43, 46.)  When that happened, the automatic deduction resulted in her only being paid for her scheduled

---

[1] Plaintiff states that while most employees were subject to variable deductions based on their allotted mealtime, (*see* Mem. of Law in Supp. of Pl's Mot. ("Pl's Mem.") 16–20 (Dkt. No. 79) (citing Lee Decl., Exs. 17–19 (Dkt Nos. 80-17, -18, -19))), some were subject to a fixed one-hour deduction, (*see id*. at 20–21 (citing Lee Decl., Ex. 18 (Dkt. No. 80-18)).

[2] Plaintiff testified that she did not know about an "additional paid time" form.  (Lee Decl., Ex. 7 ("Pl's Dep.") at 71:11–18 (Dkt. No. 80-7).)  The Court makes no factual findings about the form or the Parties' respective evidence at this stage.  See *King*, 2022 WL 292914, at *1 n.1.

shift, as opposed to the time she actually worked.  In essence, she did not receive genuine breaks but was compensated "as though she had."  (*Id*. ¶ 44.)

Relatedly, Plaintiff alleges that the automatic deduction deprived her and similarly situated workers of compensation for short breaks.  Depending on the length of their shift, employees were entitled to one or two short breaks, each lasting fifteen minutes.  (*See, e.g.*, Brown Dep. at 19:3–11.)  In contrast to meal breaks, short breaks were paid.  (*See id*.)  Yet, in situations where she worked through meal breaks, Plaintiff claims that the automatic deduction had the knock-on effect of docking pay for short rests.

Second, the meal deduction policy was tied to a different policy of rounding employee time.  It is best explained by NYPH's guidelines:

> For payroll purposes, punch-in and punch-out times are automatically rounded up or down to the nearest quarter-hour, except at the scheduled start and end of each shift. . . .  For example, if an employee is scheduled to start work at 8:00 AM and arrives any time between 7:45 AM and 8:15 AM, the system will round the time to 8:00 AM.

(Time Manual at 1.)  Plaintiff alleges this policy, combined with the automatic meal deduction, resulted in consistent time shaving.  (*See, e.g*., Am. Compl. ¶ 49.)  She provides several examples along the following lines:

| Date | Clock In | Clock Out | Hours Worked | Scheduled Start | Scheduled End | Hours Scheduled | Hours Paid | Time Shaving |
|------|----------|-----------|--------------|-----------------|---------------|-----------------|------------|--------------|
| 5/17/20 | 10:54 | 7:18 | 8.40 | 11:00 PM | 7:15 AM | 8.25 | 7.5 | -0.90 |
| 5/18/20 | 10:55 | 7:15 | 8.33 | 11:00 PM | 7:15 AM | 8.25 | 7.5 | -0.83 |

In the first example, NYPH rounded Plaintiff's start and end times to her scheduled shift, a deduction of nine minutes, then subtracted 45 minutes pursuant to the meal deduction policy. Plaintiff provides numerous similar records, including records of employees who have opted into this Action, and records for a sampling of putative class members across eight of NYPH's

4

sixteen locations.  (*See* Lee Decl., Exs. 19, 20, 22 (Dkt. Nos. 80-19, -20, -22); *see also id*.

Exs. 23, 24 (sampling of records addressing short breaks) (Dkt Nos. 80-23, -24).)[3]

    B.  Procedural History

    Plaintiff filed the Amended Complaint on January 31, 2023.  (*See* Am. Compl.)  On May

12, 2023, the Count entered a Case Management and Scheduling Order and referred the case to a

magistrate judge for pre-trial purposes including discovery.  (Dkt. No. 29.)[4]  On November 13,

2023, in the midst of discovery, Plaintiff filed a pre-motion letter in anticipation of the instant

Motion.  (*See* Dkt. No. 64.)  Defendant responded, (*see* Dkt. No. 65), and the Court adopted a

briefing schedule in lieu of a pre-motion conference, (*see* Dkt. No. 69).  The Court also stayed

the deadline for the completion of depositions pending the instant Opinion.  (*See* Order (Dkt.

No. 73).)

    Plaintiff filed her Motion on February 1, 2024.  (*See* Not. of Mot.; Pl's Mem.; Lee Decl.;

Decl. of Berlinda Tay in Supp. of Mot. ("Tay Decl.") (Dkt. No. 81).)  Along with the Motion,

Plaintiff filed declarations from four current and former employees who had consented to

become party plaintiffs under the FLSA.  (*See* Dkt. Nos. 74–77; *see also* Decl. of Joseph Teevan

in Supp. of Mot. ("Teevan Decl.") (Dkt. No. 82); Decl. of Semaye Guy in Supp. of Mot. ("Guy

Decl.") (Dkt. No. 83); Decl. of Adriel Suarez in Supp. of Mot. ("Suarez Decl.") (Dkt. No. 84);

Decl. of Shane Leible in Supp. of Mot. ("Leible Decl.") (Dkt. No. 85); Decl. of Kaylee Vasquez

in Supp. of Mot. ("Vasquez Decl.") (Dkt. No. 86).)  After an extension, (Dkt. No. 95), Defendant

filed its Opposition on March 15, 2024.  (*See* Def's Mem. in Opp. to Pl's Mot. ("Def's Mem.")

---

    [3] Plaintiff also discusses claims regarding after hours communications with supervisors.
(*See* Pl's Mem. at 17–18.)  The Court addresses those claims infra Section II.B.4.

    [4] The Court amended that Order based on an updated proposal submitted a few days later.
(*See* Dkt. No. 35.)

(Dkt. No. 106); Kosovych Decl.)  Plaintiff replied on April 1, 2024.  (Reply Mem. of Law ("Pl's

Reply") (Dkt. No. 108); Decl. of C.K. Lee in Supp. of Mot. ("Lee Reply Decl.") (Dkt. No. 109).)

## II.  Discussion

### A.  Standard of Review

#### 1.  The Two-Step Approach to Conditional Certification

The FLSA "requires employers to pay overtime compensation to covered employees."

*Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 81 (2018) (citing 29 U.S.C. § 201 et seq.).  An

employee whose rights under the FLSA were violated may file an action in any federal or state

court of competent jurisdiction "for and in behalf of himself or themselves and other employees

similarly situated."  29 U.S.C. § 216(b).  "Although the FLSA does not require them to do so,

'district courts have discretion, in appropriate cases, to implement [Section] 216(b) by

facilitating notice to potential plaintiffs of the pendency of the action and of their opportunity to

opt-in as represented plaintiffs.'"  *Viriri v. White Plains Hosp. Med. Ctr.*, 320 F.R.D. 344, 348

(S.D.N.Y. 2017) (quoting *Myers v. Hertz Corp.*, 624 F.3d 537, 554 (2d Cir. 2010) (alterations

and internal quotation marks omitted)).

Courts refer to this notice facilitation process as "certification."  *See, e.g.*, *Myers*, 624

F.3d at 555 n.10.  But it does not "create a class of plaintiffs" in the Rule 23 sense, *id*. (quoting

*Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1259 (11th Cir. 2008)); rather, it is a "case

management tool" to apprise "similarly situated" employees of the case, *id*. (quoting *Hoffmann-

La Roche Inc. v. Sperling*, 493 U.S. 165, 169 (1989)).

The Second Circuit has endorsed "a two-step method of certification in an opt-in

collective action under the FLSA."  *Lipstein v. 20X Hosp. LLC*, No. 22-CV-4812, 2024 WL

1073154, at *2 (S.D.N.Y. Jan. 24, 2024), *report and recommendation adopted*, 2024 WL

1175079 (S.D.N.Y. Mar. 19, 2024).  At the first step—"conditional certification"—the district

court must make "an initial determination and send notice to potential opt-in plaintiffs who may be 'similarly situated' to the named plaintiffs with respect to whether a FLSA violation has occurred." *Amador v. Morgan Stanley & Co. LLC*, No. 11-CV-4326, 2013 WL 494020, at *2 (S.D.N.Y. Feb. 7, 2013) (some internal quotation marks omitted). "Once a court conditionally certifies a collective action, it may then facilitate notice to all of the putative class members by approving a notice form." *Tung v. Banzai Steakhouse Inc.*, No. 22-CV-5750, 2023 WL 5827643, at *2 (S.D.N.Y. Sept. 8, 2023) (quotation marks omitted). The second step comes after discovery is completed: "'if it appears that some or all members of a conditionally certified class are not similarly situated,' a 'defendant may move to challenge certification, at which point a court will conduct a more searching factual inquiry as to whether the class members are truly similarly situated.'" *Id.* (quoting *Jenkins v. TJX Cos.*, 853 F. Supp. 2d 317, 320–21 (E.D.N.Y. 2012)).

At the first phase, a plaintiff need only make a "modest factual showing" that "[he/she] and potential opt-in plaintiffs together were victims of a common policy or plan that violated the law." *Myers*, 624 F.3d at 555 (internal quotation marks omitted); *accord Wilk v. Quality Installations of NY, Inc*., --- F. Supp. 3d ---, 2024 WL 1169024, at *4 (E.D.N.Y. Mar. 19, 2024). "Although this 'modest factual showing' cannot 'be satisfied simply by unsupported assertions,' it remains a 'low standard of proof because the purpose of this first stage is merely to determine *whether* similarly situated plaintiffs do in fact exist.'" *Tung*, 2023 WL 5827643, at *2 (quoting *Myers*, 624 F.3d at 555). "Plaintiffs may satisfy this requirement by relying on their own pleadings, affidavits, declarations, or the affidavits and declarations of other potential class members." *Hallissey v. Am. Online, Inc.*, No. 99-CV-3785, 2008 WL 465112, at *1 (S.D.N.Y. Feb. 19, 2008); *see also Vilella v. Pup Culture LLC*, No. 23-CV-2291, 2023 WL 7986562, at *3

(S.D.N.Y. Nov. 17, 2023) (same).  Because "the court applies a fairly lenient standard," courts "typically grant[] conditional certification."  *Malloy v. Richard Fleischman & Assocs. Inc.*, No. 09-CV-322, 2009 WL 1585979, at *2 (S.D.N.Y. June 3, 2009) (internal quotation marks omitted).

Importantly, at this stage, "a court should not weigh the merits of the underlying claims in determining whether potential opt-in plaintiffs may be similarly situated."  *Amador*, 2013 WL 494020, at *3 (internal quotation marks omitted).  Put differently, "the focus of the inquiry is not on whether there has been an actual violation of law but rather on whether the proposed plaintiffs are similarly situated with respect to their allegations that the law has been violated."  *Romero v. La Revise Assocs., LLC*, 968 F. Supp. 2d 639, 645 (S.D.N.Y. 2013) (internal quotations omitted).  "[A]ny factual variances that may exist between the plaintiff and the putative class do not defeat conditional class certification," *Lynch v. United Servs. Auto. Ass'n*, 491 F. Supp. 2d 357, 369 (S.D.N.Y. 2007), and even if "dates of employment and hours worked are unique to each employee," that "does not necessarily create dissimilarity under the FLSA," *Hallissey*, 2008 WL 465112, at *2.

### 2.  Alternatives Outside the Second Circuit

Until recently, the two-step approach served as "the near-universal practice to evaluate the propriety of the collective mechanism."  *Campbell v. City of Los Angeles*, 903 F.3d 1090, 1100 (9th Cir. 2018).  But the landscape changed in 2021 and again in 2023, when the Fifth and Sixth Circuits weighed in with alternatives.  *See Clark v. A&L Homecare & Training Ctr., LLC*, 68 F.4th 1003, 1010 (6th Cir. 2023); *Swales v. KLLM Transp. Servs., L.L.C.*, 985 F.3d 430, 440 (5th Cir. 2021).  Respectively, those decisions would either scrap the two-step framework entirely, *Swales*, 985 F.3d at 440–41, or apply a more exacting standard at step one akin to the

standard for preliminary injunctions, *Clark*, 68 F.4th at 1011.  Defendant asks the Court, albeit with little analysis, to adopt one of those new approaches.  (Def's Mem. 12–14.)

According to Plaintiff, the Court should not address the issue given Second Circuit caselaw.  (Pl's Reply 1.)  Indeed, the Second Circuit regards the two-step approach as "sensible" and has endorsed it three separate times in published cases.  *See Myers*, 624 F.3d at 555; *see also Scott v. Chipotle Mexican Grill, Inc*., 954 F.3d 502, 515 (2d Cir. 2020) ("[W]e have endorsed a two-step process for certifying FLSA collective actions."); *Glatt v. Fox Searchlight Pictures, Inc*., 811 F.3d 528, 540 (2d Cir. 2016) (same).[5]  Underlying those endorsements are several reasons conditional certification serves the goal of collective actions: "efficient resolution in one proceeding of common issues of law and fact."  *See Hoffmann-La Roche Inc.*, 493 U.S. at 170. Early notice avoids "duplicative suits," *see id*. at 172, and allows a district court to "set deadlines for opt-in consents and other decisions 'to expedite disposition of the action,'" *see Clark*, 68 F.4th at 1017 (White, J., concurring) (quoting *Hoffman-La Roche*, 493 U.S. at 171–72).  Further, conditional certification "may be essential 'to prevent erosion of claims due to the running statute of limitations,'" which is not tolled until potential plaintiffs opt in.  *See Lazaar v. Anthem Companies, Inc*., 678 F. Supp. 3d 434, 440 (S.D.N.Y. 2023) (quoting *Khamsiri v. George & Frank's Japanese Noodle Rest. Inc*., No. 12-CV-265, 2012 WL 1981507, at *2 (S.D.N.Y. June 1, 2012)).  Intervening early also heads off "unauthorized communications or even gossip" that might have misled plaintiffs about the case.  *See Hoffmann-La Roche*, 493 U.S. at 172.  All these

---

[5] Although it discussed the two-step approach to certification, the court in *Myers* ultimately concluded that it lacked jurisdiction to review the district court's FLSA certification analysis.  *See* 624 F.3d at 557–58 (declining to exercise pendant jurisdiction over "the Collective Action Order" and expressing no view "on that order's merits one way or the other").

functions are well served by a lenient step-one standard, which allows courts to act quickly while still weeding out implausible cases.  *See Campbell*, 903 F.3d at 1110.

Swales and Clark present a few arguments in response, but none provides sufficient reason to depart from the well-tread two-step approach.

There is some suggestion in both cases that conditional certification runs afoul of binding Supreme Court precedent.  The relevant case, *Hoffmann-La Roche*, held that facilitating notice is a matter of discretion but cautioned that the process "is distinguishable in form and function from the solicitation of claims."  *See* 493 U.S. at 174.  According to the Fifth Circuit, that language means courts "must rigorously scrutinize the realm of 'similarly situated workers' . . . from the outset of the case, not after a lenient, step-one 'conditional certification.'"  *Swales*, 985 F.3d at 434.  In other words, the entire analysis must happen in a single step after discovery. *Clark* held that a two-step sequence was permissible but likewise found that a "lenient standard" would result in notice to too many ineligible employees, "amount[ing] to solicitation of those employees to bring suits on their own."  68 F.4th at 1010.

With respect to *Swales*, nothing in *Hoffmann-La Roche* or the FLSA's text bars the use of a conditional certification procedure.  In fact, *Hoffmann-La Roche* states that the timing of district court involvement—whether "early" or "at some later time"—is a matter of discretion, 493 U.S. at 171; and beyond confirming that such discretion exists, the Supreme Court made no statement about "the details of its exercise," *id*. at 170.  "[I]nterpretive first principles," *see Swales*, 985 F.3d at 434, confirm that conclusion, as similar case management calls are left to the court where "not provided for by rule" or statute.  *See Hoffmann-La Roche*, 493 U.S. at 172 (quoting Fed. R. Civ. P. 83); *see also Campbell*, 903 F.3d at 1110 ("In the absence of any statutory directive . . . the form and timing of notice . . . is largely a question of case

management" (quotation marks omitted)).  Perhaps for that reason, "very few district courts

outside the Fifth Circuit have chosen to follow *Swales*, and no other circuit has adopted its

reasoning." *Lazaar*, 678 F. Supp. 3d at 440 (collecting cases) (quoting *Manasco v. Best In Town,

Inc.*, No. 21-CV-381, 2022 WL 816469, at *6 n.5 (N.D. Ala. Mar. 17, 2022)).  In any event, the

Second Circuit's repeated endorsements clarify that, in this Circuit, a two-step approach is at

least permissible, if not required.  *See, e.g.*, *Myers*, 624 F.3d at 555.

      Nor is it clear that a "lenient standard" is equivalent to soliciting claims.  *See Clark*, 68

F.4th at 1010.  *Clark*'s reasoning appears to be that a court "solicits" a claim any time it notifies

an employee who is not "in fact similarly situated" to the named plaintiff.  *See id.*  But its

conclusion requires a narrow reading of *Hoffmann-La Roche*.  In that case, the Supreme Court

emphasized that the "notice process" must be "distinguishable" from merely soliciting claims.

*Hoffmann-La Roche*, 493 U.S. at 174.  It did not hold that a court abuses its discretion anytime it

notifies someone who, after discovery, turns out not to be similarly situated.  By its terms, a

court complies with *Hoffman-La Roche*'s language if its "process" is one, "in form and

function," that examines whether employees are similarly situated, as opposed to just forwarding

a plaintiff's proposed notice to other employees.  *See id.*  It is unclear, from that perspective, why

a "modest standard" falls short.  Indeed, *Clark* recognizes that a court cannot conclusively "make

'similarly situated' determinations as to employees who are in no way present in the case."  68

F.4th at 1010.  And in requiring plaintiffs to meet a higher "strong likelihood" standard, it leaves

open the possibility that notice could reach employees who did not fit that description.  What

matters, in either case, is that courts are applying a substantive test for similarity.

      There are also policy concerns about a lenient approach spawning too many collective

actions that are ultimately decertified.  *Swales* reflected the concern that "the leniency of the

stage-one standard" risks "formidable settlement pressure."  985 F.3d at 436.  But any notion that

the "lenient conditional certification" standard is a rubber stamp is belied by numerous cases

where plaintiffs have failed to meet its modest factual showing.  *See, e.g.*, *Peralta v. CB Hosp. &*

*Events, LLC*, No. 22-CV-10805, 2024 WL 916523, at *6 (S.D.N.Y. Mar. 4, 2024) (finding the

plaintiff failed under the "relatively lenient" standard); *Guillen v. Marshalls of MA, Inc.*, 750 F.

Supp. 2d 469, 479 (S.D.N.Y. 2010) (same); *Levinson v. Primedia Inc*., No. 02-CV-2222, 2003

WL 22533428, at *1 (S.D.N.Y. Nov. 6, 2003) (same).  Similarly, the number of cases where

collective actions have been "decertified" indicates that courts can effectively police collective

action abuse and that step two's "searching" inquiry remains an option for parties facing pressure

to settle.  *See, e.g.*, *Thind v. Healthfirst Mgmt. Servs., LLC*, No. 14-CV-9539, 2016 WL 7187627,

at *4 (S.D.N.Y. Dec. 9, 2016) (decertifying FLSA overtime collective); *Griffith v. Fordham Fin.*

*Mgmt., Inc.*, No. 12-CV-1117, 2016 WL 354895, at *3–4 (S.D.N.Y. Jan. 28, 2016) (same).

Accordingly, the Court will apply the common two-step approach.  Although the FLSA

does not require that procedure, *see Myers*, 624 F.3d at 555 & n.10, it is the sensible way to

proceed.

### 3.  The "Modest-Plus" Approach

In the alternative, Defendant asks the Court to apply a different version of the "modest"

step one standard because the Parties have engaged in significant discovery.  (Def's Mem. 13–

14; *see also* Order (Dkt. No. 69) (ordering the instant briefing after production of certain time

and pay records).)

In some cases where "parties have completed, or substantially completed, conditional

collective certification discovery," some courts have applied a "modest plus" standard of review.

*See West v. LaserShip, Inc.*, No. 21-CV-5382, 2024 WL 1461403, at *6 (S.D.N.Y. Apr. 4, 2024)

(citing *Korenblum v. Citigroup, Inc.*, 195 F. Supp. 3d 475, 482 (S.D.N.Y. 2016)).  "Modest plus"

allows courts to "consider the evidence submitted by both parties" and determine whether "it is more likely [than not] that a group of similarly situated individuals may be uncovered by soliciting opt-in plaintiffs." *Korenblum*, 195 F. Supp. 3d at 482 (internal quotation marks omitted) (quoting *Creely v. HCR ManorCare, Inc.*, 789 F. Supp. 2d 819, 826 (N.D. Ohio 2011)); *Brown v. Barnes & Noble, Inc*., No. 16-CV-7333, 2019 WL 5188941, at *2 (S.D.N.Y. Oct. 15, 2019) (same). Put another way, "the difference between the original and 'modest-plus' standards is whether the court considers only the pleadings and attached documents, or those documents *plus* the defendant's opposing materials." *See Sydney v. Time Warner Ent.-Advance/Newhouse P'ship*, No. 13-CV-286, 2022 WL 474146, at *6 (N.D.N.Y. Feb. 16, 2022) (emphasis in original). The Court "still will not decide the ultimate merits," and it does not draw "negative inferences of any sort where evidence is lacking," as the "body of evidence is necessarily incomplete." *Korenblum*, 195 F. Supp. 3d at 482 (internal quotation marks omitted). The general idea, however, is that "the degree of scrutiny applied should increase in proportion to the discovery that has been conducted." *Id*. at 481.

While there does not appear to be a threshold amount of time that triggers "modest plus" review, the Court is aware of cases applying the standard after anywhere from six to nine months of discovery. *See Brown*, 2019 WL 5188941, at *2 (finding that "modest plus" approach "made eminent sense" where parties had completed six months of discovery "targeted to conditional certification"); *see also West*, 2024 WL 1461403, at *6 (applying modest plus review where the parties "engaged in nine months of discovery"). This case sits comfortably within that range, as the Parties engaged in approximately eight months of discovery before the Court granted Plaintiff's stay request. (*See* Order Dkt. No. 73.)

The Court therefore finds that it is appropriate to apply the "modest plus" standard here.[6] The Parties have engaged in significant certification-related discovery, including conducting sampling of the putative collective. And both rely extensively on that discovery in their papers. (*See generally* Pl's Mem.; Def's Mem.). Indeed, if the Court were to decide this Motion on the basis of "the pleadings and declarations" alone, as Plaintiff suggests, (*see* Pl's Mem. 29), "what would be the point of the discovery" on the question of conditional certification? *See Korenblum*, 195 F. Supp. 3d at 482; *see also Watterson v. RUI Mgmt. Servs., Inc.*, No. 20-CV-1783, 2022 WL 3867755, at *6 (E.D.N.Y. Aug. 30, 2022) (finding "modest-plus" review "appropriate" where parties "engaged in some discovery," including depositions, which they relied on in their motion papers); *Stewart v. Hudson Hall LLC*, No. 20-CV-885, 2021 WL 1750368, at *7 (S.D.N.Y. May 4, 2021) (applying modest plus standard where the plaintiff relied on "paystubs, timesheets, and . . . testimony" taken in discovery to support conditional certification).[7]

### B. FLSA Conditional Certification

Plaintiff moves for conditional certification as to her FLSA wage claims. (*See generally* Pl's Mem.) Specifically, she seeks certification for a statewide collective of "all current and

---

[6] Because the Court applies one of Defendant's proposed heightened standards, it need not address Defendant's request to certify the question of *whether* a heightened standard applies to the Second Circuit. (*See* Def's Mem. 14 n.4 (requesting certification unless the Court "appl[ies] a heightened or 'modest plus' standard.").) In any event, the Court is persuaded by the thorough reasoning of Judge D'Agostino in the Northern District, who denied a virtually identical request reasoning that, in the time it would take the Second Circuit to decide, the parties could fully litigate a motion to decertify the collective. *See Davella v. Ellis Hosp., Inc.*, No. 20-CV-726, 2024 WL 98352, at *2–8 (N.D.N.Y. Jan. 9, 2024).

[7] The level of scrutiny does not dictate the outcome here. As to the claims the Court certifies, *see infra* Section II.B.1–3, Plaintiff's showing survives even under this heightened standard. And it declines to certify certain claims for reasons unrelated to Plaintiff's evidentiary showing. *See infra* Section II.B.4.

former non-exempt patient care assistants, nurse assistants, physician assistants, surgical technicians, medical technicians, medical assistants, nursing attendants, care unit workers, patient pediatric assistants, and mental health workers" employed by NYPH.  (*See* Pl's Mem. 1.)  At this time, she does not seek class or collective recognition for her state law claims.  (*See id*.)  Defendant raises several arguments against conditional certification, which the Court considers in turn.

### 1.  Single Integrated Enterprise

First, Defendant briefly argues that Plaintiff has failed to demonstrate that Defendant's 16 hospitals operate as a "single integrated enterprise."  (Def's Mem. 15–16.)  The stakes relate to how broadly liability reaches in this case.  If each individual hospital constitutes the relevant "employer" for purposes of FLSA liability, *see* 29 U.S.C. § 203(d), then Plaintiff's request to proceed as a collective across the entire hospital network faces longer odds.

The FLSA imposes liability on "employers," but it does so "expansive[ly]."  *See Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999) (quoting *Falk v. Brennan*, 414 U.S. 190, 195 (1973)).  Relevant here, "multiple corporate entities can be liable as the 'employer' under 'a joint employer theory based on the theory that they operate . . . with significant interrelation of operations.'"  *Huer Huang v. Shanghai City Corp*., 459 F. Supp. 3d 580, 586 (S.D.N.Y. 2020) (quoting *Apolinar v. R.J. 49 Rest., LLC*, No. 15-CV-8655, 2016 WL 2903278, at *4 (S.D.N.Y. May 18, 2016)).  Similarly, liability attaches "where two nominally separate entities are actually part of a single integrated enterprise."  *Arculeo v. On-Site Sales & Mktg., LLC*, 425 F.3d 193, 198 (2d Cir. 2005) (quoting *Clinton's Ditch Cooperative Co. v. NLRB*, 778 F.2d 132, 137 (2d Cir.1985)).  In the latter circumstance—whether it be "parent and wholly-owned subsidiary corporations" or "separate corporations under common ownership"—an employee "technically employed on the books of one entity" may impose liability on "the

single integrated employer." *See id*.  To find such a relationship, "courts consider (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control."  *Huer Huang*, 459 F. Supp. 3d at 586 (alteration and quotation marks omitted); *see also Juarez v. 449 Rest., Inc*., 29 F. Supp. 3d 363, 367 (S.D.N.Y. 2014) (same).

Plaintiff has made a modest showing of single-enterprise status.  She presents evidence of common ownership, including quotes from Defendant's website referring to the hospitals as its "campuses," and the hospitals' employees as its "employees."  (*See* Lee Decl., Ex. 3 at 1; Lee Decl., Ex. 4 at 1.)  Beyond ownership, deposition testimony from Defendant's workforce systems personnel indicates that management oversees employees across the entire NYPH network and centralizes records in the same "work force system."  (Brown Dep. at 8–12.) Plaintiff, and other opt-in employees, claim that they were subject to the same wage policies at different hospital locations, with one employee explaining that she would receive a single check for work performed at two separate campuses.  (*See* Vasquez Decl. ¶ 3.)  And Plaintiff makes several allegations regarding NYPH's control over its subsidiary facilities, particularly relating to employment matters like compensation, hiring, and safety.  (*See* Am. Compl. ¶¶ 18–25.)  Taking Plaintiff's allegations as true, these materials demonstrate that NYPH has qualities characteristic of a single integrated enterprise.

Contrary to Defendant's framing, Plaintiff does not merely present "alleg[ations] of 'general power over various employment decisions.'"  (Def's Mem. 15–16 (quoting *Gisomme v. HealthEx Corp*., No. 13-CV-2541, 2014 WL 2041824, at *4 (E.D.N.Y. May 15, 2014)).) Plaintiff attests to specific indicia of single-enterprise status, including the centralized payment system that forms the basis for her claims.  And courts regularly hold such allegations and

16

affidavits to be sufficient at this stage. *See Garcia v. Janus Homecare Agency, Inc.*, No. 23-CV-3321, 2023 WL 7039543, at *3 (S.D.N.Y. Oct. 26, 2023) (finding a plaintiff sufficiently alleged single-enterprise status by alleging, inter alia, that the entity oversaw retirement plans, handled "day-to-day business operations," and maintained "centralized payroll" systems); *see also Qing Tian Zhuo v. Jia Xing 39th Inc.*, No. 14-CV-2848, 2015 WL 1514950, at *3–4 (S.D.N.Y. Apr. 1, 2015) (certifying collective action across multiple restaurant locations based on one employee's affidavit testifying to common ownership and personal conversations with employees who rotated among different locations).

Accordingly, Plaintiff has made an adequate showing that NYPH operates as a single integrated enterprise. Of course, as Defendant notes, that issue is not dispositive—what matters is whether Plaintiff and other hospital employees were "similarly situated with respect to the FLSA violations alleged in the [C]omplaint." *Juarez*, 29 F. Supp. 3d at 370 (internal quotation marks omitted).

### 2. Plaintiff's Rounding Claim

Defendant also argues that the putative collective is not similarly situated with respect to NYPH's alleged rounding policy. In particular, it contends that the effect of the policy varied, with many employees receiving more pay, not less. (*See* Def's Mem. 17–18.) It also argues that liability for rounding involves several individualized determinations. (*Id*. at 18–21.)

"Rounding practices are not per se unlawful under the FLSA." *Neor v. Acacia Network, Inc.*, No. 22-CV-4814, 2023 WL 1797267, at *3 (S.D.N.Y. Feb. 7, 2023) (italics and quotation marks omitted). Instead, Department of Labor regulations provide that such policies are permissible if they work as intended:

> [W]here time clocks are used, there has been the practice for many years of recording the employees' starting time and stopping time to the nearest 5 minutes, or to the nearest one-tenth or quarter of an hour. Presumably, this arrangement

17

averages out so that the employees are fully compensated for all the time they actually work.  For enforcement purposes this practice of computing working time will be accepted, provided that it is used in such a manner that it will not result, over a period of time, in failure to compensate the employees properly for all the time they have actually worked.

29 C.F.R. § 785.48(b); *see also Canelas v. World Pizza, Inc.*, No. 14-CV-7748, 2021 WL 1233998, at *10 (S.D.N.Y. Mar. 31, 2017) ("'[A] practice of rounding to the nearest one-half hour would not be inconsistent with the practices outlined in' the federal regulation." (alteration adopted) (quoting Dep't of Labor, Nov. 7, 1994 Opinion Letter, 1994 WL 1004879, at *1)).  Put differently, rounding policies violate the FLSA where they "systematically undercompensate employees."  *Boone v. PrimeFlight Aviation Servs., Inc*., No. 15-CV-6077, 2018 WL 1189338, at *7 (E.D.N.Y. Feb. 20, 2018); *Vasquez v. Victor's Cafe 52nd St., Inc.*, No. 18-CV-10844, 2019 WL 4688698, at *4 (S.D.N.Y. Sept. 26, 2019) (finding defendant's system which "rounds each punch up or down to the nearest quarter hour . . . is precisely the type of policy found to be permissible under the FLSA").

The Parties spend most of their time arguing about whether the rounding policy is neutral or whether it undercompensates Covered Employees.  (*See* Pl's Mem. 23–25; Def's Mem. 16–21)  But that dispute falls wide of the relevant inquiry.  At the conditional certification stage, the Court examines whether named and opt-in plaintiffs "share a similar issue of law or fact material to the disposition of their FLSA claims"; it does not actually *decide* those issues.  *See Scott*, 954 F.3d at 516.  Here, Plaintiff must simply make a modest showing that she and the other opt-in plaintiffs "were common victims" of a "systematically-applied [rounding] policy" that, if proven, would constitute a FLSA violation.  *McGlone v. Cont. Callers, Inc*., 49 F. Supp. 3d 364, 367 (S.D.N.Y. 2014); *see also* Newberg on Class Actions § 23:39 (5th ed. 2017) (noting that under § 216(b), the plaintiffs must demonstrate that they have all been "subjected to some common employer practice that, if proved, would help demonstrate a violation of the FLSA").

18

Plaintiff satisfies that inquiry here. Indeed, it is undisputed that a rounding policy exists across NYPH facilities. (*See* Pl's Mem. 25; Def's Mem. 3–4 ("[T]he Hospital adopted a rounding practice whereby non-exempt employee's 'punch-in and punch-out times are automatically rounded up or down to the nearest quarter-hour, except at the scheduled start and end of each shift'" (quoting Brown Dep. 22–25)).) And Plaintiff presents time records and affidavits demonstrating that the policy operated to the detriment of her and the other opt-in plaintiffs who worked different jobs at many different facilities. (Pl's Mem. 24–25 (table sampling Plaintiff's time records); *see also* Lee Decl., Exs. 19–22 (providing additional examples of alleged time-shaving).) Further, she cites deposition testimony suggesting Defendant systematically rounded to the scheduled end of an employee's shift, even when time should have been rounded to the nearest quarter hour as permitted by Section 785.48. (*See* Brown Dep. at 24:8–16; 36:3–10.) That evidence indicates that the proposed collective was subject to "precisely the kind of unlawful, non-neutral rounding policy" that, if proven, would violate the FLSA. *See Neor*, 2023 WL 1797267, at *3.

That holds true when considering Defendant's evidence about the effect of rounding. Defendant casts that evidence as a mixed bag demonstrating variation across job categories. (*See generally* Decl. of J. Michael DuMond ("DuMond Decl.") (Dkt. No. 99).) But its bottom-line conclusions support Plaintiff's case for certification. After examining roughly 1.25 million shifts for 2,229 Covered Employees, Defendant's analysis found that for nearly "70% of the work shifts, the number of clock hours were more than the number of paid hours." (*Id.* ¶ 15.) Defendant's main retort is that not all rounded time constituted compensable work activity. (Def's Mem. 20–21.) Yet a majority, or at least a plurality, of shifts remain "adversely affected by rounding" even after adopting increasingly favorable assumptions about what portion of

"clock hours" constitutes compensable work. (DuMond Decl. ¶ 17 (noting that 60.52%, 53.43%, and 46.06% of shifts are adversely affected, assuming respectively that 2, 4, and 6 minutes of each shift are not compensable).) That trend is also consistent across job categories, with 17 out of 19 job titles adversely affected on average, and across all NYPH locations. (*Id.* ¶¶ 18–19.) While Defendant focuses on the two outlier job categories and the variation in *degree* of adverse effect, those examples are clearly the exception, not the rule. (*See* Def's Mem. 16–17.) The brass tacks of that evidence furthers Plaintiff's burden at this stage, which is simply to show that "it is more likely that . . . similarly situated individuals may be uncovered by soliciting opt-in plaintiffs." *Korenblum*, 195 F. Supp. 3d at 482. And the analysis, itself, supports certification as it demonstrates that the legality of NYPH's rounding policy is subject to common, collective-wide proof.

That finding largely takes care of Defendant's second argument. What remains is a claim, sounding in Rule 23, that even if employees are similarly affected by rounding, individualized differences as to compensable time render this case inappropriate for collective treatment. (*See* Def's Mem. 21.) But as the Second Circuit explained, "if named plaintiffs and party plaintiffs share legal or factual similarities material to the disposition of their claims, 'dissimilarities in other respects should not defeat collective treatment.'" *Scott*, 954 F.3d at 516 (quoting *Campbell*, 903 F.3d at 1114). In that vein, "the 'similarly situated' requirement of 29 U.S.C. § 216(b) is considerably less stringent than the requirement of Fed. R. Civ. P. 23(b)(3) that common questions 'predominate.'" *Alonso v. Uncle Jack's Steakhouse, Inc.*, No. 08-CV-7813, 2011 WL 4389636, at *3 (S.D.N.Y. Sept. 21, 2011) (citation and internal quotation marks omitted). And the Second Circuit has repeatedly rejected the notion that a putative FLSA plaintiff must make any such showing. *See Scott*, 954 F.3d at 516 ("[I]t is already well

established that the FLSA's 'similarly situated' requirement is 'independent of, and unrelated to'
Rule 23's requirements, and that it is 'quite distinct' from 'the much higher threshold of
demonstrating that common questions of law and fact will "predominate" for Rule 23
purposes[.]'" (quoting *Kern v. Siemens Corp.*, 393 F.3d 120, 128 (2d Cir. 2004), then *Myers*, 624
F.3d at 555–56)).

Defendant notably does not provide caselaw declining to certify FLSA collectives based
on difficulties proving compensable time.  In fact, even courts applying Rule 23 have concluded
that the legality of a "consistently applied" rounding policy predominates individual questions
like whether the policy only shaved time "on a de minimis basis."  *Montiel-Flores v. JVK
Operations Ltd.*, No. 19-CV-3005, 2023 WL 5979209, at *10 (E.D.N.Y. Aug. 1, 2023)
(quotation marks and italics omitted), *report and recommendation adopted*, 2023 WL 6057375
(E.D.N.Y. Sept. 18, 2023).  (*See also* Def's Mem. 19.)  Defendant's arguments should instead be
reserved for summary judgment or decertification, where the Court can squarely address
Plaintiff's ability to prove compensable time on a collective-wide basis.  *See, e.g., Boone*, 2018
WL 1189338, at *10 (addressing, at summary judgment, whether the effect of rounding was "de
minimis"), *report and recommendation adopted*, 2018 WL 1187402 (E.D.N.Y. Mar. 7, 2018).

Accordingly, the Court grants Plaintiff's request for conditional certification as to her
rounding claim subject to the restrictions on notice discussed infra Section II.D.

### 3.  Plaintiff's Meal Break Claim

Plaintiff also seeks conditional certification of her claim that Defendant automatically
deducted time for meal breaks when she was required to work.  (Pl's Mem 13–22.)  Defendant
counters that its policy was lawful and therefore not a basis for collective certification.
Alternatively, it contends that liability is not subject to common proof.  (*See* Def's Mem. 21–26.)
As before, the key inquiry is whether Plaintiff has shown "a shared unlawful policy."

*Korenblum*, 195 F. Supp. 3d at 479. If so, "the proposed collective need not be identical in every possible respect." *Id*. (quotation marks omitted).

Several principles frame Plaintiff's showing. Per Department of Labor regulations, "[b]ona fide meal periods are not worktime" but become work if an employee "is required to perform any duties . . . while eating." 29 C.F.R. § 785.19(a); *see also Reich v. S. New England Telecomms. Corp.*, 121 F.3d 58, 65 (2d Cir. 1997) ("[M]eal periods are compensable under the FLSA when employees during a meal break perform [work] duties"). Accordingly, a policy of automatic meal deductions is not "per se illegal" assuming employees receive a full break. *Perez v. Postgraduate Ctr. for Mental Health*, No. 19-CV-0931, 2021 WL 3667054, at *4 (E.D.N.Y. Aug. 18, 2021); *Desilva v. N. Shore-Long Island Jewish Health Sys., Inc*., 27 F. Supp. 3d 313, 321 (E.D.N.Y. 2014) (same) (collecting cases); *see also Wolman v. Cath. Health Sys. of Long Island, Inc*., 853 F. Supp. 2d 290, 301 (E.D.N.Y. 2012) ("[A]doption of a system that, by default, deducts meal breaks from its employees' compensation does not constitute a policy that violates the FLSA."), *rev'd in part on other grounds sub nom. Lundy v. Cath. Health Sys. of Long Island Inc.*, 711 F.3d 106 (2d Cir. 2013). As a consequence, employers may also "shift the burden to their employees to cancel the automatic deduction if they work through an unpaid meal break." *Wolman*, 853 F. Supp. 2d at 301. An employer, in other words, does not run afoul of the FLSA simply by adopting "auto-deduct" policy and establishing a process "for an employee to report overtime." *Desilva*, 27 F. Supp. 3d at 322–23.

Despite such policies, employers can still run into trouble if they learn an employee worked through meal breaks without compensation. The rationale requires some nuance. While courts have held that there is "no duty to ensure that employees are not working" during unpaid breaks, *seeWolman*, 852 F. Supp. 2d at 301, an employer's ultimate duty to "maintain accurate

records of its employees' hours is non-delegable," *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 363 (2d Cir. 2011) (citing 29 U.S.C. § 211(c)). "In other words, once an employer knows or has reason to know that an employee is working overtime, it cannot deny compensation simply because the employee failed to properly record or claim his overtime hours." *Id*.; *see also Zivali v. AT & T Mobility LLC*, 646 F. Supp. 2d 658, 661 (S.D.N.Y. 2009) (conditionally certifying collective regarding overtime claim based on allegations that "any time worked 'off the clock' that is not inputted into [defendant's system] [went] unpaid").

Pursuant to those principles, an automatic meal deduction policy, alone, is not "a common violation of law" sufficient to "bind[] the purported collective action." *Desilva*, 27 F. Supp. 3d at 323; *see also Hinterberger v. Cath. Health Sys*., 299 F.R.D. 22, 45 (W.D.N.Y.) ("[R]equiring employees to take affirmative action to ensure payment for time worked during meal breaks does not support a common theory of statutory violations."). Instead, Plaintiff must make a modest showing that she and other employees were "routinely working through or during scheduled meal breaks, without compensation, and with knowledge of administration at the hospital." *See Colozzi v. St. Joseph's Hosp. Health Ctr.*, 595 F. Supp. 2d 200, 208 (N.D.N.Y. 2009).

On that front, Plaintiff puts forward several declarations that satisfy her lenient burden. Most persuasive, especially regarding notice, is Plaintiff's declaration that she was "constantly interrupted by managers and required to work through [meal] breaks" yet failed to receive pay of that time. (Tay Decl. ¶ 9.) She references by name two other employees, with different jobs, that shared similar experiences. (*Id*. ¶ 10) *See Reyes v. Nidaja, LLC*, No. 14-CV-9812, 2015 WL 4622587, at *3 (S.D.N.Y. Aug. 3, 2015) (noting the "consensus" that a plaintiff may "base[] an assertion of a common policy on observations of coworkers" if they "provide a minimum level

23

of detail regarding th[ose] . . . observations").  Buttressing her showing, evidence of violations

"extends beyond [Plaintiff's] own circumstances" at Westchester Hospital.  *See Jung v. Gina*

*Grp., LLC*, No. 19-CV-8624, 2021 WL 4120642, at *2 (S.D.N.Y. Sept. 9, 2021) (quotation

marks and citation omitted).  Guy, who worked at the Morgan Stanley Children's Hospital,

stated he frequently worked through lunch without pay due to a lack of relief staff, and explained

that similar issues were "common knowledge" throughout the hospital.  (Guy Decl. ¶¶ 9, 10.)

Suarez attested to "pretty much never" taking a full break, something he says "happened every

shift to everybody."  (Suarez Decl. ¶ 7.)  And Teevan claimed that he "often" was unable "to

take a free and clear meal break" with no backend compensation.  (*See* Teevan Decl. ¶ 7.)  Taken

as true, these declarations demonstrate that—despite variation in job title and location—

employees commonly worked through meal breaks without compensation.  And the extent of

that practice enables an inference, at minimum, that supervisors should have known that

employees were regularly working off the clock.  *See Colozzi*, 595 F. Supp. 2d at 208.

Plaintiff also has provided evidence that employees did that work without pay.  Indeed,

the existence of NYPH's auto-deduct policy is undisputed, and it operated to remove mealtime

from every recorded shift regardless of time actually worked.  (*See* Pl's Mem. 16–22; Def's

Mem. 4 ("[T]he Hospital's timekeeping system automatically deducts the meal period from

employees' recorded work hours each shift to account for the unpaid meal break.").)  While the

existence of that policy is not sufficient, it does aid Plaintiff's showing.  For one thing, it helps

establish NYPH's knowledge that *if* an employee worked through a break, they would not be

compensated.  The fact that employees were subject to a concededly uniform policy also

establishes a common factual thread and cuts down on the need for individualized proof, both

factors that favor collective proceeding.  *See Briceno*, 2015 WL 571 9727, at *10 ("[T]he fact

that the challenged employment practice was the same for each of the potential class members weighed 'very strongly' in favor of a collective action.") (citing *Rodolico v. Unisys Corp.*, 199 F.R.D. 468, 483 (E.D.N.Y.2001)).

This showing is aptly described as modest. Courts "have routinely granted conditional collective certification" based on much less, even "personal observations [in] one plaintiff's affidavit." *Chang Yan Chen v. Lilis 200 W. 57th Corp*., No. 19-CV-7654, 2021 WL 135248, at *4 (S.D.N.Y. Jan. 14, 2021) (collecting cases) (alteration omitted) (quoting *Mata v. Foodbridge LLC*, No. 14-CV-8754, 2015 WL 3457293, at *3 (S.D.N.Y. June 1, 2015)). Similar evidence has also allowed for enterprise-wide certification where, as here, an allegedly unlawful practice spanned multiple locations and the employer used the same payment system for all employees. *See Garcia v. Chipotle Mexican Grill, Inc*., No. 16-CV-601, 2016 WL 6561302, at *8 (S.D.N.Y. Nov. 4, 2016) (recognizing similar allegations allow for certification at "locations beyond those of which the plaintiff had first-hand knowledge" and conditionally certifying action across all New York City Chipotle locations); *see also Garcia*, 2023 WL 7039543, at *3 (same).

Defendant's contrary evidence is unavailing at this stage. It comes in two buckets, which the Court addresses in turn.

First, Defendant offers several declarations that discuss all manner of variations in meal break policy across NYPH facilities. (*See* Def's Mem. 4–6, 22; Dkt. Nos. 100–105.) Compelling as these declarations may be, the Court considers none of them. It is well established that defendants "may not defeat a court's determination that [p]laintiffs are similarly situated by submitting their own affidavits." *See, e.g.*, *Richards v. Empire Scaffolding Sys., Inc*., No. 21-CV-6638, 2022 WL 2384154, at *3 n.3 (S.D.N.Y. July 1, 2022) (quoting *Colon v. Major Perry St. Corp.*, No. 12-CV-3788, 2013 WL 3328223, at *5 (S.D.N.Y. July 2, 2013)); *see also*

*Chime v. Peak Sec. Plus*, *Inc*., 137 F. Supp. 3d 183, 202 (E.D.N.Y. 2015) (same). And that holds true even when applying "modest-plus" review because Plaintiff has not "had the benefit of full discovery" as to those affiants. *See Korenblum*, 195 F. Supp. 3d at 484; *see also Ravenell v. Avis Budget Car Rental, LLC*, No. 08-CV-2113, 2010 WL 2921508, at *5 (E.D.N.Y. July 19, 2010) ("The employee declarations submitted by [the defendant] should be discounted at this stage because Plaintiffs have not yet been able to depose the employees who signed them." (alterations adopted) (internal quotation marks omitted)).

Second, Defendant presents instances where Plaintiff's deposition purportedly contradicts her declaration and undermines her "similarly situated" showing. The most significant is Plaintiff's testimony that it was other "nurses" who "call[ed] [her] to work" on breaks as opposed to "a supervisor." (*See* Kosovych Decl., Ex. 4 ("Pl's Dep.") at 81:12–14 (Dkt. No. 98-4).) That statement appears to undercut her later-filed declaration that she was interrupted by "managers," (*see* Tay Decl. ¶¶ 6, 9), and detracts from NYPH's notice of an alleged violation. That said, it not clear that "nurses" are not also "managers," and the deposition corroborates Plaintiff's declaration in other respects. Indeed, she discusses structural staffing concerns that required her to miss breaks, (Pl's Dep. at 153:18–22). And, as to notice, Plaintiff testifies that she told "managers" about missed breaks, but that they did nothing. (*Id*. at 71:7–16.) At bottom, these statements further her core showing at this stage.

Defendant's remaining deposition excerpts are nonstarters. They establish that Plaintiff occasionally took breaks herself, (*see* Def's Mem. 24 (quoting Pl's Dep. 153:7–22)); that other nurses were able to take meal breaks (*id*. (quoting Pl's Dep. at 81–82)); that there were various reasons she may have worked during a break (*id*. at 25 (citing Pl's Dep. at 68–70)); and finally, that Plaintiff was unaware of the procedure to report time, (*id*. at 25–26 (citing Pl's Dep. at

71:11–18)).  Yet, Plaintiff's claim does not turn on whether nurses ever got breaks or the reasons her breaks were interrupted.  Rather, her core allegation is that *when* she was forced to work, a universal policy resulted in her being docked pay.  That factual nexus is consistent throughout her papers and forms a common link between her and other opt-in employees.  And the ability to report time does not sever that thread.  Employees may still be victims of a common violation "regardless of whether [they] followed the employer's policy about recording overtime," as long as the employer had reason to know they were not being paid for such time.  *See Adams v. City of New York*, No. 16-CV-3445, 2021 WL 1791182, at *5 (S.D.N.Y. May 5, 2021) (alterations adopted) (quotation marks omitted).  And here, Plaintiff has made a modest showing of constructive knowledge that employees worked during meal breaks without compensation.

Finally, Defendant avers that proof of liability would involve several individualized determinations citing several cases decertifying meal break collective actions on this basis.  (*See* Def's Mem. 26–27 & n.9.)  But those cases are distinguishable as they all applied the higher step two standard for *de*certification, which calls for "heightened scrutiny" of "disparate factual and employment settings" among plaintiffs and of possible individualized defenses.  *See, e.g.*, *Desilva*, 27 F. Supp. 3d at 320; *Kuznyetsov v. W. Penn Allegheny Health Sys., Inc*., No. 10-CV-948, 2011 WL 6372852, at *4 (W.D. Pa. Dec. 20, 2011) (same).  By contrast, it "is well-settled" that the similarly situated determination "does not require an individualized inquiry."  *Gordon v. Kaleida Health*, No. 08-CV-378S, 2009 WL 3334784, at *8 (W.D.N.Y. Oct. 14, 2009) (conditionally certifying meal break claim); *see also Worley v. City of New York*, No. 17-CV-4337, 2020 WL 915809, at *5 (S.D.N.Y. Feb. 26, 2020) ("[T]he fact that Defendants have identified individualized issues within each subgroup does not, by itself, establish that they are not similarly situated.").  Defendant's exclusive citation to decertification cases also boomerangs

as every one of those cases *conditionally* certified substantially similar claims.  *See, e.g.*, *Desilva*, 27 F. Supp. 3d at 322 (noting that "at the conditional certification stage," the court certified a collective of hourly employees "whose scheduled hours include[d] a deduction for an unpaid meal break"); *Camesi v. Univ. of Pittsburgh Med. Ctr.*, No. 09-CV-85J, 2011 WL 6372873, at *1 (W.D. Pa. Dec. 20, 2011) ("At the conditional certification stage, the Court found that [the employer's] uniform, written policies regarding meal break deductions, coupled with the named [p]laintiffs' and other affiants' sworn statements, were sufficient to meet the fairly lenient standards of similar situation at stage I.") (quotation marks omitted); *Kuznyetsov*, 2011 WL 6372852, at *1, 4 (noting the court previously "issued an order conditionally certifying [the p]laintiffs' FLSA claim" regarding "uncompensated meal breaks"); *White v. Baptist Mem'l Health Care Corp.*, No. 08-2478, 2011 WL 1883959, at *2 (W.D. Tenn. May 17, 2011), *aff'd*, 699 F.3d 869 (6th Cir. 2012) ("[T]he [c]ourt conditionally certified a class of hourly employees of [the employer] who suffered automatic deductions for lunch or other breaks, but who actually worked all or part of one or more of those lunches or breaks without receiving compensation." (alterations adopted) (quotation marks omitted)).  Accordingly, to the extent the burdens of defending a FLSA claim form the exclusive basis for denying certification, *despite* a showing of similar situatedness, they are "better suited for a decertification motion."  *See Korenblum*, 195 F. Supp. 3d at 482.

For these reasons, the Court grants Plaintiff's request for conditional certification as to her rounding claim subject to the restrictions on notice discussed infra Section II.D.

### 4.  Plaintiff's Short Break & After-Hours Communications Claims

Plaintiff also seeks to certify claims dealing with short rest breaks and after-hours communications with supervisors.  (Pl's Mem. 9–13.)  Defendant contends that Plaintiff did not actually plead these claims, (Def's Mem. 27), and Plaintiff does not mention either claim in

reply.  Assuming Plaintiff has not abandoned those claims, the Court reviewed the Amended

Complaint and agrees Defendant was not given fair notice of these independent theories of

liability.

A court at the conditional certification stage is "bound" by "the claims that can be

reasonably read into the complaint"—as is generally the case once the pleadings have closed.

*Hinterberger*, 299 F.R.D. at 53 (declining to conditionally certify class based on inadequately

plead rounding claim).  "Plaintiff may not, in effect, amend her pleadings" via such a motion

"without requesting leave from the Court."  *Harte v. Ocwen Fin. Corp*., No. 13-CV-5410, 2018

WL 1559766, at *11 (E.D.N.Y. Mar. 30, 2018) (stating that "[a p]laintiff cannot raise a new

claim through a motion for conditional certification" (quoting *Feng v. Soy Sauce LLC*, No. 15-

CV-3058, 2016 WL 1070813, at *3 (E.D.N.Y. Mar. 14, 2016) (alteration adopted))); *cf. Perez v.

City of New York*, No. 16-CV-7050, 2020 WL 1272530, at *13 n.8 (S.D.N.Y. Mar. 16, 2020)

(collecting cases holding that plaintiffs cannot raise new theories of liability at summary

judgment).

To determine whether a claim was pled courts apply Rule 8 which calls for "a short and

plain statement of the claim" tailored to "give the defendant notice of what the claim is and the

grounds upon which it rests."  *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing Fed. R. Civ. P.

8(a)) (noting that "[s]pecific facts are not necessary; the statement need only give the defendant

fair notice of what the claim is and the grounds upon which it rests."); *see also Swierkiewicz v.

Sorema N. A.*, 534 U.S. 506, 507 (2002) (same).  That requirement is forgiving; plaintiffs need

only state simply "and directly events that, they allege, entitle them to damages."  *Quinones v.

City of Binghamton*, 997 F.3d 461, 468 (2d Cir. 2021) (alteration adopted) (quoting *Johnson v.

City of Shelby*, 574 U.S. 12 (2014)).  What they may not do, however, is allege one set of events

in a complaint and discuss a different set of events in motion papers. *See Kizer v. Abercrombie & Fitch Co.*, No. 12-CV-5387, 2018 WL 6106853, at *2 n.4 (E.D.N.Y. Nov. 20, 2018) ("A party cannot amend their complaint simply by alleging new facts and theories in their memoranda . . . .") (alteration omitted) (quotation marks omitted).

Here, the Amended Complaint cannot reasonably be read to allege claims based on after-hours texts. The document simply says nothing about such communications, and similar circumstances cannot be fairly implied. Plaintiff claimed that she was due overtime because Defendants made her work through meal breaks during her shift yet automatically deducted time for those hours, anyway. (Am. Compl. ¶¶ 43–47.) Those deductions, plus Defendant's related rounding policy, are the only bases alleged for her claim of "time shav[ing]." (*Id.* ¶ 48.) In raising after-hours communications for the first time, Plaintiff does not contend that she was docked pay pursuant to those policies—both of which dealt with Plaintiff's on-shift activities rather than what she did after hours. (*See* Pl's Mem. 12–13.) Instead, her Memorandum alleges a separate practice of "requir[ing employees] to correspond with supervisors outside of working hours" without pay. (*Id.* at 13; see also Teevan Decl., Ex. A (examples of purported afterhours communications) (Dkt. No. 82-1).) The only material in the Amended Complaint to bridge that gap is a general assertion that Defendants had a "policy of not properly compensating [Plaintiff's] FLSA overtime rate." (*See* Am. Compl. ¶ 48.) But that conclusory statement is insufficient and, in any event, does not state the "grounds" for a separate FLSA violation. *See Cruz v. CSI Constr. Servs. Inc.*, No. 22-CV-0407, 2024 WL 1531147, at *5 (E.D.N.Y. Mar. 1, 2024) ("[V]ague and conclusory allegations of overtime violations in the Amended Complaint, are insufficient to warrant conditional certification." (quotation marks omitted)); *LaForgia v. Vergano*, No. 15-CV-8589, 2017 WL 3034347, at *5 (S.D.N.Y. July 14, 2017) (noting

"conclusory allegations of wrongdoing" do not satisfy Rule 8(a)); *see also Nakahata v. New York-Presbyterian Healthcare Sys., Inc*., 723 F.3d 192, 201 (2d Cir. 2013) ("Plaintiffs must provide sufficient detail about the length and frequency of their unpaid work to support a reasonable inference that they worked more than forty hours in a given week.").

Plaintiff's short-breaks claim is more complicated.  If Plaintiff is raising a standalone claim about failure to compensate short breaks, a similar rationale might apply as the Amended Complaint makes no mention of such breaks.  (*See generally* Am. Compl.)  But Plaintiff appears to state that the failure to compensate for short breaks was "a result of automatic meal break deductions."  (Pl's Mem. 10.)  And it is not hard to imagine how.  Assuming Plaintiff often did not take a full lunch break, the automatic deduction could offset compensable rest time later in the day.  *See* 29 C.F.R. § 785.18 ("Rest periods of short duration, running from 5 minutes to about 20 minutes . . . must be counted as hours worked.  Compensable time for rest periods may not be offset against other working time . . . ."); *see also Sanchez Gallego v. Adyar Ananda Bhavean Corp.*, No. 16-CV-4631, 2019 WL 131957, at *2 (S.D.N.Y. Jan. 8, 2019) (same).  Put differently, this is just another way of saying that the meal break deduction "shaved" off time Plaintiff spent working.  And that claim is stated clearly throughout the Amended Complaint.  (*See, e.g.*, Am. Compl. ¶¶ 44, 48.)  With that understanding, Plaintiff may proceed with this claim and the Court need not address Defendant's argument that Plaintiff "fabricated a[ distinct] policy."  (*See* Def's Mem. 28.)  Defendant may renew this argument at later phases of this case if Plaintiff argues a standalone FLSA violation based on a failure to compensate short breaks.

C.  Equitable Tolling

Plaintiff also asks the Court to toll the statute of limitations.  (Pl's Mem. 34–35.)  Based on Plaintiff's cited cases, she appears to request tolling for the time required to decide the instant Motion.  *See Garcia Ramos v. DNC Food Serv. Corp.*, No. 19-CV-2967, 2020 WL 2832776, at

*10 (S.D.N.Y. June 1, 2020) (tolling statute of limitations because conditional certification motion had been "pending for several months").

In a FLSA collective action, "the limitations period continues to run for each plaintiff until he or she files written consent with the court to join the lawsuit." *Tung*, 2023 WL 5827643 (quoting *Jackson v. Bloomberg, L.P.*, 298 F.R.D. 152, 170 (S.D.N.Y. 2014)).  However, "[a] district court may toll the limitations period to avoid inequitable circumstances, giving due consideration to whether the plaintiffs have acted with reasonable diligence in pursuing their claims and whether the circumstances are extraordinary enough to warrant equitable relief."  *Id.*; *see also McGlone v. Contract Callers, Inc.*, 867 F. Supp. 2d 438, 445 (S.D.N.Y. 2012) ("[C]ourts have discretion to equitably toll the limitations period in appropriate cases in order to avoid inequitable circumstances." (citation and quotation marks omitted)).

Courts in this district sometimes permit tolling "during the period the court takes to decide the conditional certification motion." *See, e.g.*, *Tung*, 2023 WL 5827643, at *7; *Jackson v. Bloomberg, L.P.*, 298 F.R.D. 152, 170 (S.D.N.Y. 2014) ("The delay required to decide a motion may warrant equitable tolling.").  They do so on the theory that it is unfair to penalize plaintiffs for a court's delay when their "putative class representatives and their counsel are diligently and timely pursuing the[ir] claims."  *See McGlone v. Contract Callers, Inc.*, 867 F.Supp.2d 438, 445 (S.D.N.Y.2012); *see also Chui v. Am. Yuexianggui of LI LLC*, No. 18-CV-5091, 2020 WL 3618892, at *10 (E.D.N.Y. July 2, 2020) ("Given the length of time that has passed since the instant motion was filed, and the diligence of Plaintiff's counsel in pursuing certification, the Court is granting equitable tolling from the date the motion was filed.").

Although there is a "trend" of authorizing tolling in FLSA cases, it is not automatic; courts must still consider whether a plaintiff was reasonably diligent and whether any

extraordinary circumstances stood in the way of filing a claim.  *See Santiago v. Cuisine By Claudette, LLC*, No. 23-CV-2675, 2023 WL 8003323, at *7–8 (E.D.N.Y. Nov. 17, 2023). Courts thus routinely decline to apply tolling where plaintiffs offer conclusory arguments or simply reference the "unique procedural posture" of FLSA collective actions.  *Id*. (denying to apply equitable tolling); *see also Cooke v. Frank Brunckhorst Co., LLC*, --- F. Supp. 3d ---, 2024 WL 1230231, at *14 (E.D.N.Y. Mar. 22, 2024) (finding tolling request "[a]t best" to be "premature" where a plaintiff presented no "extraordinary circumstances" preventing him from exercising his rights under the FLSA); *Knox v. John Varvatos Enterprises Inc*., 282 F. Supp. 3d 644, 659–60 (S.D.N.Y. 2017) (same).

Plaintiff here offers nothing more than a categorial tolling request and a reference to cases applying tolling in this posture.  (Pl's Mem. 34–35.)  And the typical features justifying tolling are not evident from the docket.  This is not a case where counsel appear especially diligent in filing the instant Motion.  *See Aleman-Valdivia v. Top Dog Plumbing & Heating Corp*., No. 20-CV-421, 2021 WL 4502479, at *7 (E.D.N.Y. Sept. 30, 2021) (finding tolling appropriate where plaintiff filed conditional certification motion one month after parties failed to settle in mediation).  Indeed, Plaintiff proceeded for discovery for six months before requesting leave to file.  (*See* Dkt. No. 30 (referring case to Judge Davison for discovery on May 13, 2023); Dkt. No. 64 (Plaintiff's letter regarding the instant Motion on November 13, 2023).)  Nor has there been a significant delay in issuing this Opinion that gives rise to "extraordinary" inequity to potential plaintiffs.  *See Viriri*, 320 F.R.D. at 355–56 (finding delay of roughly five-and-a-half months from the date motion was fully briefed was "sufficiently extraordinary to warrant equitable tolling").  *But see Mark v. Gawker Media LLC*, No. 13-CV-4347, 2014 WL 5557489,

at *2–3 (S.D.N.Y. Nov. 3, 2014) (finding eleven-month delay was not "extraordinary").

Plaintiff's request for equitable tolling is therefore denied without prejudice.

### D.  Notice

Defendant also lodges several objections to Plaintiff's proposed notice.  (Def's Mem. 30–

35.)  Despite a brief statement that the proposed notice is fair and adequate, (*see* Pl's Mem. 34),

Plaintiff does not respond to these concerns.

> To set the stage, Plaintiff seeks to notify:

> "all current and former nonexempt patient care assistants, nurse assistants, physician assistants, surgical technicians, medical technicians, medical assistants, nursing attendants, care unit workers, patient pediatric assistants, and mental health workers, employed by Defendants at all hospitals and medical clinics operated by Defendants throughout New York State on or after the date that is six (6) years before the filing of the Complaint . . . .

(Pl's Mem. 1.)  The proposed notice would advise those employees of Plaintiff's "claims

seek[ing] unpaid wages, including overtime, due to time-shaving, detrimental rounding, and

unpaid short breaks, liquidated damages, and attorneys' fees and costs."  (Lee Decl., Ex. 2

("Proposed Notice") at 1.)  The proposal would also require Defendants to produce contact

information for Covered Employees.  (*See* Pl's Mem. 33.)

#### 1.  Scope of the Collective

Defendant contends Plaintiff's request for employee contact information is overbroad

insofar as any "Covered Employees" are not similarly situated to Plaintiff.  (Def's Mem. 30.)

Relevant here, the Court notes a discrepancy between Plaintiff's papers and the Proposed

Notice mailing.  The former reference a putative collective of employees with certain job titles

that track the positions of the employees who have opted into this Action, (*see* Pl's Mem. 1),

while the latter seeks to notify "former or current non-exempt employee[s] (*including but not

limited to*[)]" those same titles, (*see* Proposed Notice at 1 (emphasis added)).  Construed literally,

the latter language could encompass nearly all NYPH employees regardless of their relationship to Plaintiff.  But that broad reading does not line up with Plaintiff's showing, which references conversations with hourly workers "who were all nurse assistants just like [her]," (*see* Tay Decl. ¶ 8), and declarations of individuals who held similar positions, (*see, e.g.*, Guy Decl. ¶ 1 (nursing attendant); Suarez Decl. ¶ 1 (patient pediatric assistant).)  Put differently, there has been no showing that the "same conditions [alleged in the complaint] extend to non-[assistant] workers at the hospital including, for example cafeteria workers, security staff, and clerical workers" and therefore no showing that "*all* hourly workers" employed by Defendant "are similarly situated." *See Colozzi*, 595 F. Supp. 2d at 208 (emphasis added) (approving notice to a subset of the putative collective).  Accordingly, in line with the changes that follow, the notice should be updated to include limiting language making clear that this Action encompasses only positions with responsibilities similar to Plaintiff's.

### 2.  Production of Contact Information

To facilitate notice, Plaintiff requests an Excel spreadsheet of "the names, titles, compensation rates, dates of employment, last known mailing addresses, email addresses and all known telephone numbers of all Covered Employees."  (*See* Lee Decl., Ex. 1 ("Proposed Order") ¶ 5.)  Courts in this district "commonly grant requests for the production of such information[] in connection with the conditional certification of an FLSA collective action."  *Liping Dai v. Lychee House, Inc.*, No. 17-CV-6197, 2018 WL 4360772, at *12 (S.D.N.Y. Aug. 29, 2018) (quotation marks omitted) (collecting cases); *Rojas v. Kalesmeno Corp.*, No. 17-CV-164, 2017 WL 3085340, at *7-8 (S.D.N.Y. July 19, 2017) (same); *see also In re Penthouse Exec. Club Comp. Litig.*, No. 10-CV-1145, 2010 WL 4340255, at *5 (S.D.N.Y. Oct. 27, 2010) (noting that "courts often order the production of such information at the notice stage").  But they only do so in a manner consistent with the scope of the collective.  *See Liping Dai*, 2018 WL 4360772, at

35

*13 (authorizing notice "consistent with th[e c]ourt's decision as to the appropriate scope of the collective").

Defendant also argues that producing "job titles, compensation rates, and dates of employment" is excessive. (Def's Mem. 31.) It also objects to producing social security numbers for the purpose of "skip tracing." (*Id*. at 31 n.10.) As to compensation and social security numbers, Defendant is correct—that information is not necessary for notice at this early stage and has been consistently held to be "unduly invasive" of employee privacy. *See Johnson-Cradle v. KPS Affiliates Inc*., No. 22-CV-1052, 2023 WL 3091675, at *8 (S.D.N.Y. Apr. 26, 2023); *see also Sarr v. Sinergia, Inc.*, No. 22-CV-3610, 2022 WL 4952972, at *5 (S.D.N.Y. Oct. 4, 2022) (denying request to produce potential collective members' social security numbers); *Ortiz v. Eskina 214 Corp.*, No. 21-CV-1537, 2021 WL 5086273, at *4 (S.D.N.Y. Nov. 2, 2021) ("This Court is not aware of authority supporting disclosure of compensation rates in connection with conditional certification notices."); *Taylor v. R.J.T. Motorist Serv., Inc.*, No. 19-CV-1155, 2020 WL 4937483, at *5 (S.D.N.Y. Aug. 24, 2020) (explaining that "compensation rates are not necessary for contacting potential opt-in plaintiffs[.]"). But courts routinely order production of titles and dates of employment, as both are highly relevant to whether employees are subject to notice. *See, e.g., Tueros v. Urb. Health Plan, Inc*., No. 21-CV-4525, 2022 WL 2752070, at *16, 18 (S.D.N.Y. July 14, 2022) (ordering production of "titles [and] dates of employment"); *Ortiz*, 2021 WL 5086273, at *4 (same). Accordingly, Defendant will be required to produce the requested contact information with the exception of compensation rates and social security numbers.

### 3. Proposed Notice Period

Defendant next argues that the Proposed Notice should be limited to individuals employed by NYPH for three years prior to the filing of the Complaint as opposed to six. (Def's Mem. 30–31.)

The three-year period is the correct one because it is consistent with the statute of limitations applicable to FLSA overtime claims, assuming Plaintiff proves a willful violation. *See* 29 U.S.C. § 255(a). While the New York Labor Law contains a six-year statute of limitations, *see* N.Y.L.L. § 198(3), Plaintiff did not seek to certify her NYLL claims, and state law lacks any such procedure. *See Ortiz*, 2021 WL 5086273, at *4 ("[T]he conditional certification procedure is specific to the FLSA.").[8] The longer period, then, would be overbroad and potentially confusing to employees who are not eligible for the opt-in class. *See id.* Therefore, the notice period is limited to three years. *See Tueros*, 2022 WL 2752070, at *16 (stating, for similar reasons, "the proper time-period is three years, not six years"); *see also Duran v. R&L Interior Renovations & Constr. Corp*, No. 20-CV-9344, 2021 WL 4847074, at *3 (S.D.N.Y. Oct. 18, 2021) ("[A] six-year notice period is not appropriate where, like here, the plaintiffs have not even moved for certification of a class for the NYLL claims" (quotation marks omitted)).

---

[8] Some cases have approved six-year notice periods where plaintiffs bring both FLSA and NYLL claims. *See, e.g.*, *Trinidad v. Pret A Manger (USA) Ltd*., 962 F. Supp. 2d 545, 563 (S.D.N.Y.2013) (collecting cases). But the trend is to limit notice to three years where plaintiffs do not also seek class certification for their NYLL claims. *See Martinez v. JLM Decorating Inc*., No. 20-CV-2969, 2021 WL 4253395, at *2 (S.D.N.Y. Sept. 17, 2021) (collecting cases); *accord Emeterio v. A & P Rest. Corp*., No. 20-CV-970, 2021 WL 101186, at *2 (S.D.N.Y. Jan. 12, 2021).

### 4.  Content of Notice & Manner of Distribution

Defendant also raises several objections to the content of the notice and the proposed manner of distribution.  (Def's Mem. 31–34.)  In lieu of addressing those objections, Defendant requests an opportunity to meet and confer with Plaintiff regarding appropriate notice, after which the Parties would submit outstanding issues to the Court.  (*Id*. at 31 n.11.)  Plaintiff does not object to that request, (*see generally* Pl's Reply), and the Court finds that it is a sensible way to proceed.  *See Flood v. Just Energy Mktg. Corp*., No. 15-CV-2012, 2016 WL 354078, at *5 (S.D.N.Y. Jan. 25, 2016) ("[C]ourts in this district have approved similar meet-and-confer sessions." (citing *Costello v. Kohl's Illinois, Inc*., No. 13-CV-1359, 2014 WL 4377931, at *8 (S.D.N.Y. Sept. 4, 2014) (directing parties to engage in meet and confer session regarding collective action notice))); *see also Valerio v. RNC Indus., LLC*, 314 F.R.D. 61, 76 (E.D.N.Y. 2016) (same).  If the Parties agree on a proposal, both they and the Court could be saved multiple rounds of back-and-forth.  Accordingly, the Court directs the Parties to meet and confer regarding Defendant's remaining objections to the form, substance, and manner of distributing notice.  The Parties shall submit a joint notice proposal consistent with the Court's findings within 30 days of this Opinion.  "Should any objections remain after the meet-and-confer, the Court directs counsel to submit a redline version of the Revised Proposed Notice for review and determination by the Court."  *See Jibowu v. Target Corp*., 492 F. Supp. 3d 87, 129 (E.D.N.Y. 2020).

III.  Conclusion

For the aforementioned reasons, Plaintiff's Motion is granted in part and denied in part. The Parties are directed to meet and confer regarding Defendant's objections to the form, substance, and manner of notifying the putative collective and submit a joint notice proposal within 30 days.  The Clerk of Court is respectfully directed to terminate the pending Motion. (*See* Dkt. No. 78.)

SO ORDERED.

Dated:    September 24, 2024
          White Plains, New York

_____
KENNETH M. KARAS
United States District Judge